**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| HARVEY JONAS YONAH FULD, | : | |
| MARY ALICE FULD, | : | |
| DANIEL YAAKOV FULD, | : | |
| EYTAN FULD, | : | |
| HILLEL CHAIM SHLOMO FULD, | : | |
| ESTATE OF JUDAH HERZEL HENKIN, | : | COMPLAINT |
| ANNE CHANA HENKIN, | : | |
| ADERET RIVKAH HENKIN, | : | |
| ELIASHIR ELIJAH HENKIN, | : | |
| JACOB BECHOR-SHALOM HENKIN, | : | |
| JOSEPH GIL HENKIN, AND | : | |
| TAAMA FREIDA HENKIN YAAKOVSON | : | |
| | : | |
| PLAINTIFFS | : | |
| | : | |
| v. | : | |
| | : | |
| THE PALESTINIAN AUTHORITY | : | |
| | : | |
| and | : | |
| | : | |
| THE PALESTINE LIBERATION ORGANIZATION | : | |
| | : | |
| DEFENDANTS | : | |

## INTRODUCTION

1.    Plaintiffs bring this Complaint pursuant to 18 U.S.C. § 2333(d) of the Anti-Terrorism Act ("ATA"), 18 U.S.C. §§ 2331-2339D, against Defendants, the Palestinian Authority ("PA"), and the Palestine Liberation Organization ("PLO"), which have collectively and collaboratively spent decades knowingly helping Harakat al-Muqawama al-Islamiyya a/k/a the Islamic Resistance Movement ("HAMAS"),

## JURISDICTION AND VENUE

2.    This Court has jurisdiction over this matter and over defendants pursuant to 18 U.S.C. §§2333, and 2334 and the rules of supplemental jurisdiction, as this is an action by United

States nationals who have been injured "in [their] person, property or business by reason of an act of international terrorism." Subject matter jurisdiction is also conferred by 28 U.S.C. §§ 1331 and 1332, as this involves a federal question, and the matter in controversy is between citizens of a State and citizens of a foreign state, and exceeds the sum or value of $75,000.

3.    The Southern District of New York is the proper venue for this action pursuant to 18 U.S.C. §2334(a), since defendants Palestinian Authority and Palestine Liberation Organization maintain an office and agent in this district and are residents in this district. Moreover, defendants Palestinian Authority and Palestine Liberation Organization are "deemed to have consented to personal jurisdiction," pursuant to 18 U.S.C. §2334(e)(1)(A), the Promoting Security and Justice for Victims of Terrorism Act of 2019, (the "PSJVTA"), which provides that a defendant "shall be deemed to have consented to personal jurisdiction," in ATA cases if, after April 18, 2020, a defendant has made any payment "to *any* payee designated by *any* individual who, after being fairly tried or pleading guilty, has been imprisoned for committing any act of terrorism that injured or killed a national of the United States, if such payment is made by reason of such imprisonment; or (ii) to *any* family member of *any* individual, following such individual's death while committing an act of terrorism that injured or killed a national of the United States, if such payment is made by reason of the death of such individual." 18 U.S.C. §2334(e)(1)(A)(i)(ii) (emphasis added). In addition, Defendants have consented to jurisdiction under 18 U.S.C. §2334(e)(1)(B)(iii), which provides that a defendant "shall be deemed to have consented to personal jurisdiction" in ATA cases if, after January 4, 2020, the defendant "conducts any activity while physically present in the United States on behalf of the Palestine Liberation Organization or the Palestinian Authority," subject to specified exceptions. 18 U.S.C. §2334(e)(1)(B)(iii). Furthermore, Defendants have consented to jurisdiction under 18 U.S.C. §2334(e)(1)(B)(i), which provides that a defendant has

consented to jurisdiction if, after January 4, 2020, it "continues to maintain any office, headquarters, premises, or other facilities or establishments in the United States," unless "used exclusively for the purpose of conducting official business of the United Nations." 18 U.S.C. §2334(e)(1)(B)(i).

4.    Defendants have a long-standing practice pursuant to which they provide monthly payments to families of Palestinian or pro-Palestinian individuals who were injured or killed in the context of the Palestinian-Israeli conflict. Such individuals include suicide terrorists. This practice was described in detail in January 2015 in documents and testimony at trial in *Sokolow v. Palestine Liberation Org.*, No. 04 Civ. 397 (GBD) (S.D.N.Y.), *e.g.*, Trial Tr. 593-94, 603-04.

5.    Defendants call these payments "martyr" payments. According to the Washington Post, the PA's "Foundation for the Care of the Families of Martyrs, has an annual budget of $173 million and operates within the Palestinian Authority's Ministry of Social Affairs. The foundation gives support to any individual 'wounded, killed, or otherwise affected as a result of their joining the revolution or the presence of the revolution . . . .'" David Makovsky, Ghaith al-Omari and Lia Weiner, *If Palestinians are Serious about Peace, 'Martyr' Violence Should Not Pay,* Wash. Post (April 6, 2017), available at: https://www.washingtonpost.com/news/global-opinions/wp/2017/04/06/if-palestinians-are-serious-about-peace-martyr-violence-should-not-pay.

6.    The entity that Defendants have used to make payments to security prisoners has changed over time. In May 2020, the *Jerusalem Post* reported: "In 2014, the PA closed the PA Ministry of Prisoners' Affairs, and in 2015 it created the PLO Commission of Prisoners' Affairs. In 2018, it reopened the PA Ministry of Prisoners' Affairs and in 2019 it changed its name to the Commission for Detainees' Affairs. Now in 2020, it is trying to hide its payments by moving them once again from the PA to the PLO." Donna Rachel Edmunds, *PA Hiding Terrorist Salaries from*

*Donor Countries in Financial Reports*, Jerusalem Post (May 6, 2020), available at https://www.jpost.com/arab-israeli-conflict/pa-hiding-terrorist-salaries-from-donor-countries-in-financial-reports-627111.

7.      The Defendants have defied the United States and have publicly stated that they continued to make these Pay-for-Slay payments after the trigger date provided in the PSJVTA (120 days after the enactment of the PSJVTA, i.e., April 18, 2020), and will continue to do so forever. For example, on June 8, 2020, PA Prime Minister Mohammad Shtayyeh stated in a television interview that, "[W]e continued to pay the prisoners and the *shahids* [martyrs] in full …We will remain committed to this until Judgment Day, until we are victorious, until the bloodbath stops, and until the prisons are closed. This is one issue to which we remain committed."[1]

8.      Other examples wherein the Defendants confirmed their payments of the Pay for Slay program include:

   a.   On September 20, 2018, the Palestinian Prisoner Affairs Commission spokesman, Hassan Abd Rabbo, stated, "We are not bashful or secretive about our support for our prisoners.  The [Jabarin] family would be eligible to receive a monthly salary of NIS 1,400, ($390), if their son is not freed by Israel and it completes all the necessary documents."  Times of Israel, U.S. Envoy: Abbas Pay to Family of Terrorist Who Killed Ari Fuld is Unconscionable, September 20, 2018.  Abd Rabbo added that the sum would increase if Jabarin would remain in prison for several years.  *Id.*  Former PA Prisoners' Affairs Minister Ashraf al-Ajrami confirmed Abd Rabbo's statements, as well.  *Id.*

---

[1] http://www.memri.org/reports/palestinian-prime-minister-mohammad-shtayyeh-we-are-reconsidering-our-1993-recognition.

b.  On September 26, 2019, Chairman Abbas stated in a speech to the United Nations General Assembly: "Even if we only have one penny left, we will give it to the martyrs, the prisoners and their families. . . .  We view the prisoners and the martyrs as planets and stars in the skies of the Palestinian struggle, and they have priority in everything."  *See*, *e.g.*, The Times of Israel, *Abbas Vows to Continue Stipends to Terrorists, even with PA's 'last penny,'"* July 24, 2018; The Jerusalem Post, *Abbas: We Won't Stop Payments to Martyrs and Prisoners*, July 24, 2018.

c.  On March 29, 2020, the PA's Prime Minister Mohammed Shtayyeh declared that "we will pay full salaries this month over several days to prevent the public from crowding in front of banks . . . [t]he third day for prisoners and martyrs," as announced by WAFA, the official PA news agency.  https://english.wafa.ps.

d.  On April 16, 2020, PA President Mahmoud Abbas declared "[t]he issue of the prisoners will remain our first priority despite all the difficulties we are facing. This is to preserve the just, inalienable rights of our people," as announced by WAFA, the official PA news agency.  *Id.*

e.  On July 5, 2020, Qadri Abu Bakr, the head of Defendants' Ministry of Prisoners and Ex-Prisoners, "stated that the Finance Ministry had transferred all of the prisoners' allowances into their bank accounts, along with the date the allowances were to be paid," as announced by WAFA.  *Id.*  WAFA also reported that Minister "Abu Bakr demanded that all banks commit to paying the prisoners' allowances and refrain from closing any of the accounts, or cancelling any of the ATM cards, considering that failing to pay the prisoners' allowances would violate the

directives of the [Palestine] Monetary Authority and the government, and that it would violate the agreement that had previously been concluded." *Id.*

f.  On July 9, 2020, Qadri Abu Bakr, the head of Defendants' Ministry of Prisoners and Ex-Prisoners, was interviewed on official Palestinian Television. When asked about the prisoner payments, he stated: "Regarding the salaries, everything was 100% on Wednesday [July 8, 2020], obviously, after contact, of course, with a number of the banks that had stopped the payments.  And nearly all the prisoners- we did not receive a single call from any prisoner.  They went to the banks and it was paid to them."  Official PA TV, Giants of Endurance, July 9, 2020.

g.  On August 4, 2020, in his declaration in the underlying case, Tareq Mustafa, Director General of the Budget Department at the Palestinian Authority's Ministry of Finance, admitted that "one payment, in the amount of 1,400 NIS (approximately $400 USD), was transferred to the mother of Jabarin in October 2019."  Mustafa Dec., dated August 4, 2020, ¶ 6.

h.  On January 7, 2024, the Official PA daily *Al-Hayat Al-Jadida*, reported that Chairwoman of the PLO Families of the Martyrs and Wounded Institution Intisar Al-Wazir said that, "the leadership led by [PA] President Mahmoud Abbas is committed to taking care of the families of our Martyrs and wounded and makes sure to guarantee a dignified life for them."[2]

i.  In a February 20, 2025, speech at the Fatah Revolutionary Council, PA President Mahmoud Abbas confirmed that the Palestinian Authority would continue its

---

[2] https://palwatch.org/page/34924

payments to Palestinians who committed terrorist attacks against Israelis, "I told you once, and I stand by my word, that if we have only a single penny left, it will go to the prisoners and the martyrs."[3]

9.    With regard to the payments described above, the PLO and PA act in coordination and/or common control with one another.  According to a witness called by Defendants at trial in *Sokolow v. PLO*, both the Martyr's Foundation and the Ministry for Prisoners and Ex-Prisoners have been "moved" between the PLO and the PA, and that the decision to move these institutions was made by Mahmoud Abbas, President of the PA and Chairman of the PLO.  Trial Transcript (Feb. 10, 2015) at 3132-33 in *Sokolow v. PLO*, No. 04 Civ. 397 (GBD), ECF Doc. 878 (Testimony of Hanan Ashrawi) (S.D.N.Y. filed Mar. 4, 2015).

10.    Upon information and belief, the PA has provided funds to the PLO with the knowledge and/or intent that the PLO would make the payments described above.

11.    At all times relevant hereto, defendants PLO and PA have encouraged and incentivized terrorism with the egregious practice of providing these generous financial payments to families of Palestinians who engage in acts of terrorism and to individuals incarcerated in Israeli prisons.  Wall Street Journal, *Ending Aid to Terrorists, Palestinian Law Rewards Those Who Kill Jews, Including Americans*, November 13, 2016; Bloomberg Opinion, *The Palestinian Incentive Program for Killing Jews*, July 1, 2016; Wall Street Journal, *Pay for Slay in Palestine, U.S. Aid Becomes a Transfer Payment for Terrorists*, March 27, 2017; Jerusalem Post, *How to End the Palestinian Authority's 'pay-for-slay' laws*, March 6, 2017; The Tower Magazine, *Abbas Defends Payments to Terrorists After Meeting With U.S. Envoys*, June 22, 2017.

12.    Moreover, defendants PA and PLO refer to Palestinians who commit terror attacks

---

[3] https://www.memri.org/tv/palestinian-president-mahmoud-abbas-payment-prisoners-continue?utm

in Israel and otherwise as "heroes" and to those Palestinians who are killed while carrying out terror attacks as "martyrs," which serves to not only legitimize, but extol all acts against Israel, including violent acts such as murder.  The Washington Post, *If Palestinians Are Serious About Peace, 'Martyr' Violence Should Not Pay*, April 6, 2017.  In 2009, PA President Mahmoud Abbas stated that payments would continue to be made for prisoners belonging to the PLO.  Palestine News Network, *Stipends for PLO-member political prisoners*, March 4, 2009.

13.    The PA has been spending more than $300 million per year, comprising roughly 7-8 percent of its total budget, supporting two foundations: one established for the purpose of assisting families of "martyrs," The Foundation for the Care of the Families of Martyrs, and the second for Palestinians who are incarcerated in Israeli prisons, a program codified in 2004 Palestinian Law No. 14, the Aid for Prisoners in Israeli Prisons.  *Id*.  The law provides for monthly salaries to prisoners, along with an entire compensation package and reward upon the prisoner's release from prison, including various economic preferential treatments.  *Id*.  In 2014, in the face of international pressure on PA to cease payments, PA President Mahmoud Abbas transferred the Ministry of Prisoners' Affairs from PA to PLO, which Abbas also chairs.  *Id*.; Forward, *Does Aid to Palestinians Subsidize the Families of Terrorists?*, August 23, 2016.  In fact, defendants PA and PLO fund one another.  *See id*.  In June of 2016, PA's budget report listed a transfer of $137.45 million to PLO in support of PLO's program to protect its prisoners and their families.  *Id*.  In 2018, the *Washington Post*'s "Fact Checker" column reported that approximately "13,000 Palestinian men and women are beneficiaries of the prisoner payments, which totaled about $160 million," and approximately "33,700 families (19,700 in the Palestinian territories) shared in about $183 million in martyr payments."  Glenn Kessler, *Does the Palestinian Authority pay $350 million a year to 'terrorists and their families?'* Wash. Post (March 14, 2018), available at:

https://www.washingtonpost.com/news/fact-checker/wp/2018/03/14/does-the-palestinian-authority-pay-350-million-a-year-to-terrorists-and-their-families.  Following the October 7, 2023 HAMAS attack on Southern Israel and its aftermath, the PA has recognized an additional 23,210 martyrs and 3,550 prisoners.[4]

14.     As of mid-2018, Karem Fathi Lotfi Razek, who was convicted of murdering the Henkin couple and sentenced to two life sentences and an additional 30 years in prison, had been paid 40,600 shekels under the auspices of the Palestinian Authority, a monthly salary of 1,400 shekels for three years. His expected cumulative salary when he reaches the age of 80: 11,232,000 shekels.  Zir Ziad Omar, who was also convicted of murdering the Henkin couple and sentenced to two life sentences and an additional 30 years in prison, had by that time earned 40,600 shekels. His monthly salary at the time was still 1,400 shekels. Expected cumulative salary when he reaches the age of 80: 10,056,000 shekels. Another terrorist convicted from the same Henkin attack, Yahya Hajj Muhammad, will benefit from an accumulated amount of 10,080,000 by the age of 80.[5]

15.     Moreover, Defendants have also made at least one payment to the family of Kahlil Yousef Ali Jabarin, who murdered Ari Yoel Fuld in an act of terror on September 16, 2018. Mustafa Dec., dated August 4, 2020, ¶ 6 ("[O]ne payment, in the amount of 1,400 NIS (approximately $400 USD), was transferred to the mother of Jabarin in October 2019.").

16.     Defendants have thus admitted that they made payments constituting consent to jurisdiction under 18 U.S.C. § 2334(e)(1)(A).

17.     Defendants PLO and PA have also consented to personal jurisdiction under 18 U.S.C. § 2334(e)(1)(B)(i), because after the trigger date provided in the PSJVTA (15 days after the enactment of the PSJVTA, i.e., January 4, 2020), defendants continued to maintain

---

[4] https://palwatch.org/page/34924
[5] https://news.walla.co.il/item/3155675

offices, headquarters, premises and other facilities in the United States, at a building owned by them at 115 East 65th Street in New York. That building is used, among other things, as a personal residence, and to conduct propaganda, social media, and other public relations activities that are unrelated to the official business of the United Nations.

18.     Defendants PLO and PA have also consented to personal jurisdiction under 18 U.S.C. § 2334(e)(1)(B)(iii), because after January 4, 2020, Defendants and their employees and agents conducted and continue to conduct activities on the Defendants' behalf while being physically present in the United States including extensive propaganda, public relations, lobbying, and social media activities that are unrelated to the official business of the United Nations.

*Consular Services*

19.     For many years, Defendants have provided "consular services," such as the authentication of birth and death certificates, and other forms, through agents located in the United States, including Ahmad Alahmad, Samir Farhat, and Awni Abu Hdba.  For example, in 2019, Defendants' agent Awni Abu Hdba participated in the authentication of a document while located in New Jersey.  These activities were described in detail in the Declaration of David Russell filed in the Second Circuit in *Sokolow v. Palestine Liberation Org.*, No. 15-3135 (DE 305-5) at pp. A278-82.

20.     Upon information and belief, after January 4, 2020, one or more agents described in paragraph 19 have participated in the authentication and/or consideration of documents for authentication on behalf of the PA and PLO while physically located in the United States, including by transmitting documents for authentication to employees of the PA's Ministry of Foreign Affairs.

21.     The PA's Ministry of Foreign Affairs acts as the PLO's agent.  According to

Defendants, the PA's "ultimate authority is the PLO," and the PA "was made accountable to the PLO Executive Committee." *Legal Consequences of the Construction of a Wall in the Occupied Palestinian Territory (Request for an Advisory Opinion)*, Written Statement Submitted by Palestine at ¶¶ 118–119 (Jan. 30, 2004), https://www.icj-cij.org/files/case-related/131/1555.pdf.

22.     The PA's Ministry of Foreign Affairs website acknowledges that the PA "cannot assume roles or functions not delegated to it by the PLO." App. to Supp. Mem. in Support of Plaintiffs-Appellants' Motion to Recall the Mandate, *Sokolow v. Palestine Liberation Org.*, No. 15-3135 (DE 305-5), at p. A249, A252.

23.     The PLO has delegated to the PA a role in the PLO's conduct of activities at the UN Mission in New York. In 2005, the PA adopted "The Diplomatic Corps Law No. 13-2005." According to this law, the PA's Ministry of Foreign Affairs is charged with "[o]verseeing all missions politically, administratively and financially," (§ 3); and all staff with the rank of "Ambassador" are appointed by the PA's President, (§§ 7, 9).

24.     In accordance with this law, PA President Abbas appointed Riyad Mansour to head the Palestinian UN Mission, on September 10, 2005, with the civil service rank of "ambassador" within the PA's Foreign Ministry, serving as the PLO's Permanent Observer to the United Nations. Dr. Mansour continues to head the Mission today, and other PA officials also staff the office.

*Political Propaganda Activities and Proselytizing*

25.     Subsequent to January 4, 2020, while physically in the United States, Defendants have conducted press conferences and created and distributed informational materials.

26.     Defendants' communications made while physically in the United States were adapted to and/or intended to influence the public within the United States in furtherance of Defendants' political interests and/or to affect U.S. foreign policy.

27.     On February 11, 2020, Mahmoud Abbas, Chairman of the PLO and President of the PA, held a press conference with a retired Israeli politician in New York City, during which Chairman Abbas criticized the U.S. anticipated Israel–Palestine Peace Plan.  Chairman Abbas said: "A few days ago, the so-called deal of the century was introduced by America and totally went against international law and does not make way for a two-state solution. This cannot be a basis for any future negotiations as it will not make way for a joint peace."

28.     The PLO maintains an office in the United States.

29.     The PLO holds itself out to be, and carries out conduct in the name of, the State of Palestine, in connection with official business of the United Nations.

30.     The PA's Ministry of Foreign Affairs acts as the PLO's agent in connection with activities in the United States. For example, Dr. Mansour holds an appointment as an officer of the PA.

31.     Dr. Mansour holds himself out as "Ambassador, Permanent Observer of the State of Palestine to the United Nations."

32.     The PA holds itself out to be, and carries out conduct in the name of, the State of Palestine in connection with official business of the United Nations.

33.     After January 4, 2020, Defendants have maintained and updated a website and Twitter and Facebook accounts in the name of the State of Palestine, through which they publish communications in English adapted to or intended to influence the public within the United States.

34.     Facebook and Twitter are United States-based social media companies.

35.     Upon information and belief, Defendants' website is maintained by a service provider physically located in the United States.

36.     Upon information and belief, Defendants have updated their website and/or their

United States-based social-media accounts while physically inside the United States.

37.    After January 4, 2020, Defendants have used their website to publish communications in English adapted to and/or intended to influence the public within the United States in furtherance of Defendants' political interests and/or to affect U.S. foreign policy.

38.    Such communications included the following examples:

a.    January 13, 2020: Defendants published a letter on their website asserting that Israel is carrying out a "frenzied, illegal colonization campaign."  https://english.wafa.ps.

b.    February 14, 2020: Defendants published a letter on their website asserting that Israel was engaging in "relentless crimes, provocation, incitement and inflammatory rhetoric."  *Id.*

c.    February 20, 2020: Defendants published a letter on their website asserting that Israel was engaged in "continuing illegal settlement activities, land grab and annexation schemes."  *Id.*

d.    February 26, 2020: Defendants published a letter on their website asserting that Israel "persists in rabid pursuit of its illegal colonization schemes."  *Id.*

e.    March 13, 2020: Defendants published a letter on their website asserting that Israel "escalates the pace of its illegal annexation and colonization schemes and its aggressions and inflammatory rhetoric against the Palestinian people."  *Id.*

f.    April 2, 2020: Defendants published a letter on their website asserting that Israel "has not for a minute ceased its illegal policies and practices."  *Id.*

g.    April 15, 2020: Defendants published a letter on their website asserting that "Israel continues to cynically exploit the international community's focus on the life and death circumstances imposed by the COVID-19 pandemic, to entrench its illegal

occupation, advance annexation, and escalate its repression of Palestinians." *Id.*

h.  April 29, 2020: Defendants published a letter on their website asserting that Israel's accusations of antisemitism are used to "taint legitimate criticism" by those who "dare to denounce Israel's violations of the Palestinian people's rights and its colonization of their land." *Id.*

i.  May 13, 2020: Defendants published a letter on their website asserting that "not a day has passed where Israel has not cynically exploited the COVID-19 crisis, globally and locally, to forge ahead with its annexationist plans and in full coordination with the current US administration." *Id.*

j.  June 4, 2020: Defendants published a letter on their website asserting that Israel "continues its depraved dehumanization of the Palestinian people and colonization of Palestinian land." *Id.*

k.  July 24, 2020: Defendants published a letter on their website asserting that Israel "forges ahead with its expansionist policies in the West Bank, cementing its illegal occupation and escalating its aggression against the Palestinian people, their land and their rights." *Id.*

l.  August 6, 2020: Defendants published a letter on their website asserting that there were "continuing and escalating illegal policies and practices of Israel, the occupying Power, and its extremist military and settler forces." *Id.*

m.  August 17, 2020: Defendants published a letter on their website asserting that "Israel carries on with its illegal colonization and annexation measures in our land and with its repression of the Palestinian people through measures of collective punishment, dispossession, displacement and other violations of their rights." *Id.*

39.    After January 4, 2020, Defendants also published on their website English translations of numerous speeches given by Palestinian representatives at the United Nations. These translations were adapted to and/or intended to influence the public within the United States in furtherance of defendants' political interests and/or to affect U.S. foreign policy.

40.    Such publications included the following examples:

a.    February 11, 2020: Defendants assert that the proposed U.S. peace plan "contains diktats, consecrates occupation and annexation by military force, and would lead to an Apartheid system, an anachronistic reality being implemented today in Palestine. It rewards occupation instead of holding it accountable for the crimes it has committed for decades against our people and land." *Id.*

b.    April 23, 2020: Defendants assert that Israel should "stop its colonization and de facto annexation of Palestinian land; end its immoral blockade on the Gaza Strip; and release the thousands of Palestinians, including children, that it has imprisoned…. Israel carries on with its illegal policies and practices, business as usual." *Id.*

c.    May 27, 2020: Defendants assert, "Israel has demonstrated time and time again its contempt for the rule of international law and for Palestinian rights and lives." *Id.*

d.    June 24, 2020: Defendants assert that Israel is "drunk on power, propelled by infinite impunity, motivated by one single thought that it has been under the influence of for decades: grabbing maximum Palestinian land with minimum Palestinians." *Id.*

e.    July 21, 2020: Defendants assert that the Palestinian people has been "dispossessed, exiled, occupied, colonized, annexed and deprived of their

fundamental human rights." *Id.*

41.     Since January 4, 2020, Defendants have updated their Twitter account more than 200 times and their Facebook account more than 125 times.  Upon information and belief, some or all of these updates were done by persons and/or on computers that were physically present in the United States.

42.     Defendants' Twitter and Facebook updates have included communications in English adapted to and/or intended to influence the public within the United States in furtherance of Defendants' political interests and/or to affect U.S. foreign policy.

43.     Finally, Defendants have consented to jurisdiction under 18 U.S.C. §2334(e)(1)(B)(i), which provides that a defendant has consented to jurisdiction if, after January 4, 2020, it "continues to maintain any office, headquarters, premises, or other facilities or establishments in the United States," unless "used exclusively for the purpose of conducting official business of the United Nations."

44.     Defendants own and maintain an office, premises, or other facility located in a townhouse at 115 East 65th Street in New York City.  Defendants own the building in which the facility is located in the name of the "Permanent Observer Mission of Palestine to the United Nations."  Deed to 115 East 65th Street, reproduced at App. to Supp. Mem. in Support of Mot. to Recall Mandate, pp. 275-76, *Waldman v. Palestine Liberation Org.*, No. 15-3135, ECF Doc. 305-5 (2d Cir. Filed Mar. 25, 2019).

45.     Agents, officers, and/or employees of the PLO have used the East 65th Street facility since January 4, 2020.  Such activities have been conducted in the name of the State of Palestine.

46.     Agents, officers, and/or employees of the PA have used the East 65th Street facility

16

since January 4, 2020.  Such activities have been conducted in the name of the State of Palestine.

47.     Each Defendant employs one or more employees in the United States who have used the East 65th Street Facility to publish one or more communications described above.

## THE PARTIES

### A. **The Plaintiffs**

### **The Fuld Family**

48.     Ari Fuld was murdered on September 16, 2018 by a terror attack committed by HAMAS, a Foreign Terrorist Organization ("FTO").   At the time of the acts alleged, and at all other times relevant hereto, Ari Fuld was a citizen of the United States and at all times relevant hereto, a victim of "torture" as defined in the TVPA and "personal injury" and "death" as required by 28 U.S.C. § 1605A.

49.     Plaintiff Harvey Jonas Yonah Fuld was, and at all times relevant hereto, the biological father of Ari Fuld and a citizen of the United States. Plaintiff Harvey Jonas Yonah Fuld can sue and be sued in this Court.

50.     Plaintiff Mary Alice Fuld was, and at all times relevant hereto, the biological mother of Ari Fuld and a citizen of the United States. Plaintiff Mary Alice Fuld can sue and be sued in this Court.

51.     Plaintiff Daniel Yaakov Fuld was, and at all times relevant hereto, the biological brother of Ari Fuld and a citizen of the United States. Plaintiff Daniel Yaakov Fuld can sue and be sued in this Court.

52.     Plaintiff Eytan Fuld was, and at all times relevant hereto, the biological brother of Ari Fuld and a citizen of the United States. Plaintiff Eytan Fuld can sue and be sued in this Court.

53.     Plaintiff Hillel Chaim Shlomo Fuld was, and at all times relevant hereto, the

biological brother of Ari Fuld and a citizen of the United States. Plaintiff Hillel Chaim Shlomo Fuld can sue and be sued in this Court.

## The Henkin Family

54.     Eitam Simon Henkin was murdered on October 1, 2015 by a terrorist attack committed by HAMAS, a Foreign Terrorist Organization. At the time of the acts alleged, and at all other times relevant hereto, Eitam Simon Henkin was a citizen of the United States and at all times relevant hereto, a victim of "torture" as defined in the TVPA and "personal injury" and "death" as required by 28 U.S.C. § 1605A.

55.     Plaintiff Estate of Judah Herzel Henkin is represented in this action by Anne Chana Henkin. Judah Herzel Henkin was, and at all times relevant hereto, the biological father of Eitam Simon Henkin, and a citizen of the United States. Plaintiff Judah Herzel Henkin can sue and be sued in this Court.

56.     Plaintiff Anne Chana Henkin was, and at all times relevant hereto, the biological mother of Eitam Simon Henkin, and a citizen of the United States. Plaintiff Anne Chana Henkin can sue and be sued in this Court.

57.     Plaintiff Aderet Rivkah Henkin Stern was, and at all times relevant hereto, the biological sister of Eitam Simon Henkin, and a citizen of the United States. Plaintiff Aderet Rivkah Henkin Stern can sue and be sued in this Court.

58.     Plaintiff Eliashir Elijah Henkin was, and at all times relevant hereto, the biological brother of Eitam Simon Henkin, and a citizen of the United States. Plaintiff Eliashir Elijah Henkin can sue and be sued in this Court.

59.     Plaintiff Jacob Bechor-Shalom Henkin was, and at all times relevant hereto, the biological brother of Eitam Simon Henkin, and a citizen of the United States. Plaintiff Jacob

Bechor-Shalom Henkin can sue and be sued in this Court.

60.     Plaintiff Joseph Gil Henkin was, and at all times relevant hereto, the biological brother of Eitam Simon Henkin, and a citizen of the United States. Plaintiff Joseph Gil Henkin can sue and be sued in this Court.

61.     Plaintiff Taama Freida Henkin was, and at all times relevant hereto, the biological mother of Eitam Simon Henkin, and a citizen of the United States. Plaintiff Taama Freida Henkin can sue and be sued in this Court.

B. **The Defendants**

62.     Defendant THE PALESTINIAN AUTHORITY, also known as The Palestinian Interim Self-Government Authority, and/or The Palestinian National Authority, and/or The Palestinian Council, (PA) , is, and at all times relevant hereto was, a legal person as defined by 18 U.S.C. §2331(3).  Defendant PA is a public body within the meaning of N.Y. C.P.L.R. §1023.

63.     Defendant THE PALESTINE LIBERATION ORGANIZATION (PLO) , is, and at all times relevant hereto was, a legal person as defined by 18 U.S.C. §2331(3).  Defendant PLO is a public body within the meaning of N.Y. C.P.L.R. §1023.

## STATEMENT OF FACTS

64.     The PLO was formed in 1964.  Defendants' Response to Plaintiffs' Rule 56.1 Statement ¶ 1, *Sokolow v. Palestine Liberation Org.*, No. 04 Civ. 397 (GBD), ECF Doc. 523-1 (S.D.N.Y. filed June 6, 2014).

65.     Since its establishment in 1964, and through the present day, defendant PLO has funded, planned, and carried out thousands of terrorist bombings, shootings, and other attacks, resulting in the deaths of hundreds of innocent civilians and the wounding of thousands more. Dozens of United States citizens have been murdered, and scores more wounded, by terrorist

attacks carried out and encouraged by defendant PLO.  Congress has explicitly found that "the

PLO and its constituent groups have taken credit for, and been implicated in, the murders of dozens

of American citizens abroad . . . [and] the PLO covenant specifically states that armed struggle is

the only way to liberate Palestine, thus it is an overall strategy, not merely a tactical phase . . . .

Congress determines that the PLO and its affiliates are a terrorist organization and a threat to the

interests of the United States . . . ."  22 U.S.C. §5201.  At all times relevant hereto, the PLO has

funded, encouraged, carried out, and utilized terrorist attacks as an established and systematic

policy and practice to advance and achieve its political goals.

66.    In 1974, the PLO was invited by the United Nations General Assembly to

"participate in the sessions and the work of the General Assembly in the capacity of observer."

Observer status for the Palestine Liberation Organization, G.A. Res. 3237, 29 U.N. GAOR Supp.

(No. 31) at 4, U.N. Doc. A/9631 (1974).

67.    In 1980, the PLO's Permanent Observer, acting in his official capacity, purchased

a townhouse located at 115 East 65th Street in the City and County of New York.  Deed,

reproduced at App. to Supp. Mem. in Support of Mot. to Recall Mandate, pp. 270-272, *Waldman*

*v. Palestine Liberation Org.*, No. 15-3135, ECF Doc. 305-5 (2d Cir. Filed Mar. 25, 2019).

68.    15.    In 1993, the PLO and the State of Israel signed a "Declaration of

Principles," (the "DOP"), which followed the signatories' mutual recognition.  The DOP

anticipated Palestinian self-rule in Gaza and Jericho, (Art. V), the transfer of power and

responsibilities to Palestinians in the West Bank, (Art. VI), and an agreement on self-government

and the election of a Palestinian council, (Art. III).  Defendants' Response to Plaintiffs' Rule 56.1

Statement ¶ 5, *Sokolow v. Palestine Liberation Org.*, No. 04 Civ. 397 (GBD), ECF Doc. 523-1

(S.D.N.Y. filed June 6, 2014).

69.     Following further negotiations, the PLO and the State of Israel entered into a series of bilateral agreements. These agreements included, inter alia, the "Gaza-Jericho Agreement," signed in Cairo in 1994; the "Agreement on Preparatory Transfer of Powers and Responsibilities," also signed in 1994; and the Israeli-Palestinian Interim Agreement on the West Bank and the Gaza Strip, (the "Interim Agreement"), signed in 1995.  Defendants' Response to Plaintiffs' Rule 56.1 Statement ¶ 6, *Sokolow v. Palestine Liberation Org.*, No. 04 Civ. 397 (GBD), ECF Doc. 523-1 (S.D.N.Y. filed June 6, 2014).

70.     Following the 1995 execution of the Interim Agreement, the PLO created the PA. Defendants' Response to Plaintiffs' Rule 56.1 Statement ¶ 9, *Sokolow v. Palestine Liberation Org.*, No. 04 Civ. 397 (GBD), ECF Doc. 523-1 (S.D.N.Y. filed June 6, 2014).

71.     The PA's "ultimate authority is the PLO," and the PA is "accountable to the PLO Executive Committee."  Legal Consequences of the Construction of a Wall in the Occupied Palestinian Territory (Request for an Advisory Opinion), Written Statement Submitted by Palestine at ¶¶ 118–119 (S.D.N.Y. filed Jan. 30, 2004), https://www.icj-cij.org/files/caserelated/131/1555.pdf.

72.     The PA "cannot assume roles or functions not delegated to it by the PLO." PA Ministry of Foreign Affairs Website, translated and reproduced at App. to Supp. Mem. in Support of Mot. to Recall Mandate, pp. 249-54, *Waldman v. Palestine Liberation Org.*, No. 15-3135, ECF Doc. 305-5 (2d Cir. Filed Mar. 25, 2019).

73.     In the Interim Agreement, the PLO and the State of Israel assigned certain governmental duties in the West Bank and Gaza to the PA.  Defendants' Response to Plaintiffs' Rule 56.1 Statement ¶ 7, *Sokolow v. Palestine Liberation Org.*, No. 04 Civ. 397 (GBD), ECF Doc. 523-1 (S.D.N.Y. filed June 6, 2014).

74.     Since its creation by the PLO, the PA has provided many government services, including local policing and civil authority over traditional matters such as agriculture, banking, employment, environmental protection, unclaimed property, health, labor, zoning, postal services, social welfare, telecommunications, transportation, water and sewage, and the PA has a police force and levies taxes. Defendants' Response to Plaintiffs' Rule 56.1 Statement ¶ 9, *Sokolow v. Palestine Liberation Org.*, No. 04 Civ. 397 (GBD), ECF Doc. 523-1 (S.D.N.Y. filed June 6, 2014).

75.     Following its establishment in 1995, and through the present day, defendant PA, as the governing body of the PLO, has funded, encouraged, planned, and carried out hundreds of terrorist bombings, shootings, and other terrorist attacks, resulting in the deaths of hundreds of civilians and the wounding of thousands more.  Dozens of United States citizens have been murdered, and many more wounded, by terrorist attacks carried out and encouraged by defendant PA.

76.     Article 9.5 of the Interim Agreement provides that the PA "will not have powers and responsibilities in the sphere of foreign relations, which sphere includes the establishment abroad of embassies, consulates or other types of foreign missions and posts or permitting their establishment in the West Bank or the Gaza Strip, the appointment of or admission of diplomatic and consular staff, and the exercise of diplomatic functions."  Interim Agreement Art. 9.5(a), available at:     https://peacemaker.un.org/sites/peacemaker.un.org/files/IL%20PS_950928_InterimAgreementWestBankGazaStrip%28OsloII%29.pdf.

77.     The PLO states that it has delegated to the PA a role in the PLO's conduct of foreign activities, including its activities at the UN Mission in New York.  In 2005, the PA adopted "The Diplomatic Corps Law No. 13-2005."  According to this law, the PA's Ministry of Foreign Affairs is charged with "[o]verseeing all missions politically, administratively and financially," (§ 3); and

all staff with the rank of "Ambassador" are appointed by the PA's President, (§§ 7, 9).  The Diplomatic Corps Law No. 13-2005, translated and reproduced at App. to Supp. Mem. in Support of Motion to Recall Mandate, pp. 214-24, *Waldman v. Palestine Liberation Org.*, No. 15-3135, ECF Doc. 305-4 (2d Cir. Filed Mar. 25, 2019).

78.     In accordance with this law, PA President Abbas appointed Riyad Mansour to head the Palestinian UN Mission on September 10, 2005, with the civil service rank of "ambassador" within the PA's Foreign Ministry, serving as the PLO's Permanent Observer to the United Nations. Palestinian Gazette, Decision No. 122 of 2005, translated and reproduced at App. to Supp. Mem. in Support of Motion to Recall Mandate, pp. 234-40, *Waldman v. Palestine Liberation Org.*, No. 15-3135, ECF Doc. 305-4 (2d Cir. Filed Mar. 25, 2019).

79.     Upon information and belief, Dr. Mansour continued in this position after January 4, 2020.

80.     According to testimony of Salam Fayyad, "after the PA came into being, the PLO . . . ceased to have its own independent sources of funding largely. . . .  [F]unding for its own operations did come from the PA." Deposition of Salam Fayyad, p. 76:2-7, *Saperstein v. Palestinian Auth.*, No. 04-20225-CIV (S.D. Fl. given Mar. 9, 2010).  Dr. Fayyad was the PA's Finance Minister from June 2002 to November 2005, and from March 2007 to May 2012, and he was the PA's Prime Minister between June 2007 and June 2013.

81.     Upon information and belief, the PLO has received all or substantially all its funding from the PA at all relevant times, including after January 4, 2020.

82.     As described herein, Defendants have made payments to the designees of prisoners imprisoned for committing terror attacks and to the families of suicide terrorists by reason of the terror attacks.  The entities through which Defendants have channeled these payments have been

moved repeatedly back and forth between the PLO to the PA at the discretion of Chairman/President Abbas.

**HAMAS**

83.    HAMAS is a violent terrorist organization. Because of its history of conducting terror attacks, the United States Government designated Hamas as a Specially Designated Terrorist (1995), under E.O. 12947, a Foreign Terrorist Organization (1997), under 8 U.S.C. § 1189, and a Specially Designated Global Terrorist (2001), under E.O. 13224. Hamas has remined designated to this day. These designations of Hamas were public events, well known to the entire international community, including Defendants. In addition, numerous HAMAS leaders and fundraisers are designated by the United States Government as Specially Designated Nationals whose assets have been frozen as a result of their activities for HAMAS.

84.    HAMAS was formed in December 1987 as an outgrowth of the Muslim Brotherhood. Hamas has the declared goal of eliminating Israel and establishing an Islamist state that covers present-day Israel, the Gaza Strip, and the West Bank. 37. For example, HAMAS's original 1988 charter states that "[t]here is no solution to the Palestinian problem except by Jihad"; is replete with xenophobic, anti-Semitic references; and openly calls for a genocidal war of ethnic cleansing against Jews in "Palestine." In October 1988, in an interview to the Kuwaiti newspaper al-Anbaa, Khalil al-Quqa, who was then considered to be the aide of Sheikh Ahmad Yassin (a founder of HAMAS), said: "Allah gathered the Jews in Palestine not for them to have a homeland, but with the intent that it will become their mass grave." In the Jordan Times, on October 12, 1997, an article quoted Yassin as saying, "Hamas's goal is to establish an Islamic state on the ruins of Israel."

85.    HAMAS achieves its stated goals through its military, political, and social wings.

The military wing, the Izz el-Din al-Qassam Brigades, carries out murderous attacks within Israel, the West Bank, and Gaza. These attacks target civilians and have resulted in deaths and injuries to many civilian men, women, and children—including U.S. nationals and Plaintiffs in this action.

86. HAMAS proudly proclaims its strategies of using violent attacks to terrorize the civilian population and to influence government officials in Israel and the United States. Since its founding, HAMAS has launched numerous violent attacks, including bombings, suicide attacks, rocket attacks, shooting, stabbings, and vehicular attacks. These attacks have killed or injured a significant number of people. In recent years, HAMAS has also expanded its use of hostage taking and attempted hostage taking to gain leverage in negotiations with the Israeli government and to disrupt the Israeli-Palestinian peace process. HAMAS continues to support, advocate for, and publicly endorse jihad and martyrdom in connection with attacks against Israel and its allies, including the United States.

## THE DEFENDANTS MATERIAL SUPPORT OF HAMAS

87. HAMAS's ability to carry out complex attacks—such as the October 1, 2015 terrorist attack that murdered Eitam Simon Henkin and the September 16, 2018 terrorist attack which murdered Ari Fuld (hereinafter collectively "Terrorist Attacks"), requires access to weapons and logistical networks. While Iran is a primary external funder, the Defendants also provide material support through budgetary transfers and lack of enforcement against HAMAS cells in the West Bank contributes to operational capacity.

88. In addition, the stipends the Defendants pay to families of Palestinians imprisoned for terrorism or killed during attacks in its "pay-for-slay." financial incentive structure helps HAMAS recruit its members to conduct acts of "international terrorism".

89. According to a U.S. Government Accountability Office (GAO) report, the PA has

received hundreds of millions of dollars in security assistance, including training and equipment for its security forces[6]

90.    HAMAS operatives have used PA issued IDs and infrastructure to move weapons and personnel across checkpoints.

91.    For example, in the murder of Eitam and Na'ama Henkin, the HAMAS cell operated in the West Bank, under the jurisdiction of the Defendants, and use roads controlled by the Defendants to conduct the attack.

92.    Moreover, in PA run media and education systems, the Defendants glorify martyrdom and promote HAMAS aligned narrative such to serve as substantial assistance to HAMAS.

<u>**THE MURDER OF ARI FULD WAS AN ACT OF**</u>
<u>**INTERNATIONAL TERRORISM[7]**</u>

93.    On September 16, 2018, Ari Fuld, an American citizen, was stabbed and killed in the Gush Etzion junction in Israel, located adjacent to a community where Israelis, Jews and Americans reside, work, shop and live.

94.    The murder of Ari Fuld on September 16, 2018 was committed by HAMAS, through a heinous act of murder by one of its terrorists with the material aid and support of Defendants, and was an act of international terrorism.

95.    Ari Fuld left his home for a routine shopping trip near the popular Rami Levy supermarket at the Gush Etzion Junction when he was targeted by Khalil Jabarin and stabbed multiple times in the upper back and neck by the terrorist using a 21-centimeter knife. After he

---

[6] GAO-10-505 Palestinian Authority: U.S. Assistance Is Training and Equipping Security Forces, but the Program Needs to Measure Progress and Faces Logistical Constraints
[7] In the matter of *Fuld v Islamic Republic of Iran, et al*, 20-cv-2444 (RCL), the Court found that Ari Fuld was murdered by Khalil Jabarin in an act of international terrorism and the Khalik Jabarin was a member of HAMAS

was stabbed, he pursued, shot, and wounded the terrorist, who was by that point attempting to also attack a local shop employee.  While the shop employee's life was spared, Fuld, who was transported to the hospital, subsequently died from his fatal injuries.

96.    An investigation revealed that the terrorist who stabbed and murdered Ari Fuld was carried out by HAMAS terrorist -Khalil Yusef Ali Jabarin.  Jabarin was arrested, indicted, and convicted for the murder of Ari Fuld and the attempted murder of three others.

97.    A few hours after the attack, HAMAS praised the attack.

98.    Eventually, HAMAS, through the official website of Al-Qassam Brigades, took responsibility for the terrorist attack by releasing a video.  In the video, the spokesperson for the Al-Qassam Brigades shows pictures of Khalil Jabarin and a video of Jabarin fleeing from the scene of the terrorist attack.  The video includes captions proclaiming that HAMAS' jihadist soldiers will continue their presence in the West Bank and will not leave.

99.    HAMAS was and is neither a sovereign entity nor *de facto* government, but rather was and remains a Specially Designated Foreign Terror Organization at all times relevant hereto.

## THE MURDER OF EITAM SIMON HENKIN WAS AN ACT OF INTERNATIONAL TERRORISM[8]

100.    On October 1, 2015, Eitam Simon Henkin, an American citizen, his wife and four children were driving past the town of Beit Furik when he and his wife were shot and killed.

101.    The death of Eitam Simon Henkin on October 1, 2015 was committed by HAMAS, a Foreign Terrorist Organization, with the material aid and support of the Defendants was an act of international terrorism.

102.    Eitam Simon Henkin, his wife and four children were driving in their van past the

---

[8] In the matter of *Henkin v Islamic Republic of Iran,* 18-cv-1273 (RCL), the Court found that Eitam Simon Henkin was murdered in an act of international terrorism and that the perpetrators (XXXXXXXXX) were members of HAMAS.

town Beit Furik when the vehicle was overtaken by three assailants, who shot and wounded Eitam Simon Henkin and his wife. After the vehicle was stopped, the assailants came to the car. After a struggle between Eitam Simon Henkin and one of the assailants, he and his wife were shot and killed in front of their children.

103.    An investigation revealed that the attack upon Eitam Simon Henkin was carried out by a HAMAS cell. The assailants who planned and conducted the attack were HAMAS operatives Yahia Mihammed Naif Abdullah Hajj Hamad, Samir Zahor Ibrahim Kusah, Karem Lufti Fatahi Razek, Zir Ziad Jamal Amar and Ragheb Ahmad Muhammad Aliwi. Each were arrested and indicted for murder, confessing to the murders and providing details of the attack.

104.    Following the attack, on October 2, 2015 HAMAS leader Mushi al-Masri praised the attack as a "heroic operation" and as a "natural response to the crimes of the enemy."  On several occasions, including every year on the anniversary of the attack, HAMAS has taken credit for the attack and recognized those in the cell that carried out the Attack as members of HAMAS.

105.    HAMAS was neither a sovereign entity nor *de facto* government at all times relevant hereto.

## FIRST COUNT
### AGAINST DEFENDANTS ON BEHALF OF ALL PLAINTIFFS, INTERNATIONAL TERRORISM PURSUANT TO 18 U.S.C. §2333

106.    The preceding paragraphs are incorporated by reference as though fully set forth herein.

107.    The actions of the Defendants described herein constitute "acts of international terrorism" as defined in 18 USC § 2331.

108.    As required by § 2331, the actions of the defendants described herein constituted a violation of numerous criminal laws of the United States and of the several States (or, if carried

28

out in the United States, would constitute such violations), including without limitation the provisions of 18 U.S.C. §§ 2339A, 2339B and 2339C, which criminalize the provision of material sup-port or resources to terrorist organizations and/or for terrorist activities. HAMAS has been continuously designated as a Foreign Terrorist Organization since 1995 and Specially Designated Global Terrorist Organization since 2001 and the provisions of resources, to an FTO, or an SDGT, such as HAMAS, is a crime under numerous provisions of United States law, including the provisions of Chapter 113B of Title 18 of the United States Code.

109.    As required by § 2331, the actions of the Defendants were dangerous to human life by their nature and as evidenced by their consequences. HAMAS is a deadly, notoriously dangerous group, which has carried out hundreds of murderous terrorist attacks.

110.    Defendants' acts constitute a violation of the criminal laws of the United States and of the several States or would constitute criminal violations if committed within the jurisdiction of the United States and of the several States. The actions of Defendants violate, or if committed within U.S. jurisdiction would violate literally scores of federal and state criminal statutes prohibiting, inter alia and without limitation: homicide, battery, assault, as well as the criminal prohibitions against aiding and abetting, attempting, serving as an accessory to, solicitation of and conspiracy to commit these and other such felonies. Among other things, Defendants have committed criminal solicitation, which is a crime under 18 U.S.C. 373 and under New York State Law, including N.Y. Penal L. 100.08, 125.25.

111.    The acts of Defendants described herein were performed pursuant to and as implementation of an established policy of utilizing terrorist attacks in order to achieve their goals. Specifically, the acts of Defendants described herein were intended to terrorize, intimidate, and coerce the civilian population in Israel into acquiescing to Defendants' political goals and

demands, and to influence the policy of the United States and Israeli governments in favor of accepting defendants' political goals and demands.  Moreover, Defendants, themselves and through their respective officials, representatives, spokesmen, communications media and other agents; (a) repeatedly admitted to committing acts of terrorism and violence against the civilian population in Israel and the West Bank and expressly stated that these acts were intended both to intimidate and coerce that civilian population into acquiescing to Defendants' political goals and demands and to influence the policy of the United States and Israeli governments in favor of Defendants' political goals and demands, and (b) expressly threatened the further occurrence of such terrorist acts if their political goals and demands were not achieved.  The acts of Defendants described herein therefore appear to be and were in fact intended to intimidate and coerce a civilian population, and to influence the policy of a government by intimidation or coercion, within the meaning of 18 U.S.C. §2331.

112.    Defendants' acts were dangerous to human life, by their nature and as evidenced by their consequences.

113.    Defendants' acts occurred outside the territorial jurisdiction of the United States.

114.    The acts of Defendants are therefore, "acts of international terrorism," as defined under 18 U.S.C. §§2331 and 2333.  The behavior of Defendants also constitutes aiding and abetting acts of international terrorism, and conspiracy to commit acts of international terrorism.

115.    As a direct and proximate result of the acts of international terrorism committed by Defendants, including the statements made by President of the PA and Chairman of the PLO, Mahmoud Abbas, and other representatives of Defendants, and which Defendants aided and abetted and/or conspired to commit, Plaintiffs were caused severe injury, including: pain and suffering; pecuniary loss and loss of income; loss of guidance, companionship and society; loss of

consortium; severe emotional distress and mental anguish; and loss of solatium.

116.    Defendants are therefore jointly and severally liable for the full amount of Plaintiffs' damages, in such sums as may hereinafter be determined.

117.    Defendants' conduct was outrageous in the extreme, wanton, willful, and malicious, and constitutes a threat to the public at large, warranting an award of punitive damages.

**SECOND COUNT**
**AGAINST DEFENDANTS ON BEHALF OF ALL PLAINTIFFS,**
**LOSS OF CONSORTIUM AND SOLATIUM**
**UNDER COMMON LAW and PURSUANT TO 18 USC 2333(a)**

118.    The preceding paragraphs are incorporated by reference as though fully set forth herein.

119.    As a result and by reason of the death of Ari Yoel Fuld, which was caused by the actions of Defendants described herein, plaintiffs Harvey Jonas Yonah Fuld, Mary Alice Fuld, Daniel Yaakov Fuld, Eytan Fuld, And Hillel Chaim Shlomo Fuld have been deprived of the services, society, consortium, and solatium of their deceased child or sibling, and have suffered and will continue to suffer severe mental anguish, bereavement and grief, and injury to their feelings.

120.    As a result and by reason of the death of Eitan Simon Henkin, which was caused by the actions of Defendants described herein, plaintiffs Estate of Judah Herzel Henkin, Anne Chana Henkin, Aderet Rivkah Henkin, Eliashir Elijah Henkin, Jacob Bechor-Shalom Henkin, Joseph Gil Henkin, and Taama Freida Henkin Yaakovson have been deprived of the services, society, consortium, and solatium of their deceased child or sibling, and have suffered and will continue to suffer severe mental anguish, bereavement and grief, and injury to their feelings.

121.    Defendants are therefore jointly and severally liable for the full amount of Plaintiffs' damages, in such sums as may hereinafter be determined.

122.    Defendants' conduct was outrageous in the extreme, wanton, willful, and malicious, and constitutes a threat to the public at large, warranting an award of punitive damages.

### THIRD COUNT
### AGAINST DEFENDANTSON BEHALF OF ALL PLAINTIFFS,
### NEGLIGENCE
### UNDER COMMON LAW

123.    The preceding paragraphs are incorporated by reference as though fully set forth herein.

124.    Defendants, personally and/or through their agents and/or employees and /or co-conspirators, willfully and deliberately and/or wantonly and/or negligently authorized, encouraged, and assisted in the September 16, 2018 Terrorist Attack that harmed Plaintiffs.

125.    Defendants had legal duties under local and other applicable law to desist from engaging in, or authorizing and encouraging, acts of violence, and to refrain from deliberately and/or wantonly, and/or negligently authorizing or causing the infliction of injuries to persons such as the plaintiffs herein.

126.    Defendants' behavior constituted a breach of these legal duties.

127.    Defendants foresaw, or should have reasonably foreseen, that their breach of these legal duties would create unreasonable risk of injuries such as those suffered by the Plaintiffs to persons such as the Plaintiffs.

128.    But for Defendants' wrongful and/or unlawful and/or negligent acts, Plaintiffs would not have suffered severe injury, including: death; pain and suffering; pecuniary loss and loss of income; loss of guidance, society and companionship; loss of consortium; severe emotional distress and mental anguish; and loss of solatium.

129.    Defendants are therefore jointly and severally liable for the full amount of Plaintiffs' damages, in such sums as may hereinafter be determined.

130.    Defendants' conduct was outrageous in the extreme, wanton, willful, and malicious, and constitutes a threat to the public at large, warranting an award of punitive damages.

**FOURTH COUNT**
**AGAINST DEFENDANTS ON BEHALF OF ALL PLAINTIFFS**
**NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS**

131.    The preceding paragraphs are incorporated by reference as though fully set forth herein.

132.    Defendants' conduct was willful, outrageous and/or grossly negligent, and was dangerous to human life, and constituted a violation of applicable criminal law and all international standards of civilized human conduct and common decency.

133.    Defendants' conduct caused the Plaintiffs egregious emotional distress.

134.    Defendants are therefore jointly and severally liable for the full amount of plaintiffs' damages, in such sums as may hereinafter be determined.

135.    Defendants' conduct was outrageous in the extreme, wanton, willful, and malicious, and constitutes a threat to the public at large, warranting an award of punitive damages.

**FIFTH COUNT**
**AGAINST DEFENDANTS ON BEHALF OF ALL PLAINTIFFS,**
**CIVIL CONSPIRACY UNDER COMMON LAW AND**
**PURSUANT TO  18 USC §2333(d)**

136.    The preceding paragraphs are incorporated by reference as though fully set forth herein.

137.    The Terrorist Attacks constituted acts of "international terrorism, as defined in 18 USD §2331

138.    HAMAS planned and committee the Terrorist Attacks.

139.    HAMAS was designated an FTO under section 219 of the Immigration and Nationality Act (8 U.S.C. § 1189), as of the dates on which it planned and committed the Terrorist

Attacks.

140.    HAMAS is a "person" within the meaning of 18 USC §2333(d)(1).

141.    The Defendants engaged in a long-term common scheme and conspiracy with HAMAS, and with each other, which lasted from the 1990s until at least the Terrorist Attacks, the goal of which was using terrorist violence and the threat of terrorist violence to cause Israel to cede territories governed by it and remove the Jewish residents therefrom. Pursuant to that common scheme and conspiracy, Defendants provided HAMAS with extensive material support and in order to enable and support HAMAS's terrorist activities in tandem with the Defendants conducted political activities to achieve their territorial demands while warning their interlocutors that a failure to grant their demands would result in terrorist attacks by HAMAS. As part of that conspiracy, the Defendants and HAMAS adopted a fictitious division of roles, in order to enable the Defendants to falsely disassociate themselves in the public arena from terrorism that they themselves facilitated, encouraged and desired. HAMAS carried out the Terrorist Attacks pursuant to and in furtherance of that common plan and conspiracy with the Defendants.

142.    The Defendants are therefore liable under 18 USC §2333(d) as co-conspirators for the full amount of Plaintiffs damages as may be determined and trebled pursuant to 18 USC §2333.

143.    Defendants knowingly and willingly conspired, agreed and acted in concert with each other, in a common plan and design to facilitate and cause acts of terrorism, including, without limitation, by agreeing, pursuant to their Pay for Slay laws, to pay those who commit acts of terror, such as the those in which Plaintiffs were harmed.

144.    As a result of the Terrorist Attacks caused, resulting from, and facilitated by Defendants' conspiracy, Plaintiffs suffered the damages enumerated herein.

145.    Defendants are therefore jointly and severally liable for the full amount of

plaintiffs' damages, in such sums as may hereinafter be determined.

146.    Defendants' conduct was outrageous in the extreme, wanton, willful, and malicious, and constitutes a threat to the public at large, warranting an award of punitive damages.

## SIXTH COUNT
### AGAINST DEFENDANTS ON BEHALF OF ALL PLAINTIFFS, AIDING AND ABETTING UNDER COMMON LAW AND PURSUANT TO 18 USC § 2339(d)(JASTA)

147.    The preceding paragraphs are incorporated by reference as though fully set forth herein.

148.    The Terrorist Attacks constituted acts of "international terrorism, as defined in 18 USD §2331

149.    HAMAS planned and committee the Terrorist Attacks.

150.    HAMAS was designated an FTO under section 219 of the Immigration and Nationality Act (8 U.S.C. § 1189), as of the dates on which it planned and committed the Terrorist Attacks.

151.    HAMAS is a "person" within the meaning of 18 USC §2333(d)(1)

152.    The Defendants knowingly aided and abetted HAMAS in committing the Terrorist Attacks, by providing substantial assistance to HAMAS. Specifically, the Defendants provided HAMAS with the extensive material support and resources discussed above, for many years prior to the Terrorist Attacks, which they knew and intended would enable, facilitate, support and assist HAMAS to carry out acts of terrorism such as the Terrorist Attacks.

153.    Defendants provided one another, and their organs, agencies, instrumentalities, officials, agents and employees, and their other co-conspirators with material support and resources and other substantial aid and assistance, in order to aid, abet, facilitate, and cause the commission of acts of terrorism, including the October 1, 2015 and September 16, 2018 Terrorist

Attacks in which plaintiffs were harmed.

154.    As a result of the October 1, 2015 and September 16, 2018 Terrorist Attacks, which was caused, resulted from, and was facilitated by Defendants' provision of material support and resources and other acts of aiding and abetting, including, without limitation, Defendants' practice of paying monthly stipends to those who commit acts of terror pursuant to their Pay for Slay laws, Plaintiffs suffered the damages enumerated herein.

155.    Defendants are therefore jointly and severally liable for the full amount of plaintiffs' damages, in such sums as may hereinafter be determined.

156.    Defendants' conduct was outrageous in the extreme, wanton, willful, and malicious, and constitutes a threat to the public at large, warranting an award of punitive damages.

**SEVENTH COUNT**
**AGAINST DEFENDANTS ON BEHALF OF ALL PLAINTIFFS,**
**VICARIOUS LIABILITY/RESPONDEAT SUPERIOR**
**UNDER COMMON LAW AND PURSUANT TO 18 USC 2333(a)**

157.    The preceding paragraphs are incorporated by reference as though fully set forth herein.

158.    At all relevant times, defendants PLO and PA engaged in the actions described herein within the scope of their agency, office, and employment, and in furtherance of the interests of defendants PLO and PA.

159.    Defendants PLO and PA authorized or ratified, and condoned, encouraged, incentivized, and incited the actions described herein their agents, including Khalil Yousef Ali Jabarin and Yahid Muhammed Naif Abdullah Hajj Hamad, Samir Zahor Ibrahim Kusah, Karem Lufti Fatahi Razek, Zir Ziad Jamal Amar and Ragheb Ahmad Muhammad Aliwi.

160.    Therefore, Defendants PLO and PA are vicariously liable under the principles of respondent superior for the acts of their agents, including Khalil Yousef Ali Jabarin and Yahid

Muhammed Naif Abdullah Hajj Hamad, Samir Zahor Ibrahim Kusah, Karem Lufti Fatahi Razek, Zir Ziad Jamal Amar and Ragheb Ahmad Muhammad Aliwi.

161.    Defendants are therefore jointly and severally liable for the full amount of plaintiffs' damages, in such sums as may hereinafter be determined.

162.    Defendants' conduct was outrageous in the extreme, wanton, willful, and malicious, and constitutes a threat to the public at large, warranting an award of punitive damages.

**EIGTH COUNT**
**AGAINST DEFENDANTS ON BEHALF OF ALL PLAINTIFFS**
**INDUCEMENT**
**UNDER COMMON LAW**

163.    The preceding paragraphs are incorporated by reference as though fully set forth herein.

164.    Defendants PLO and PA offered and provided their own and each other's officials, agents, and employees with substantial material and pecuniary inducements and incentives to plan, organize, and execute acts on international terrorism, including the Terrorist Attacks in which Plaintiffs were harmed.  Defendants PLO and PA did so, knowing that the acts for which they provided inducements and incentives were illegal and/or tortious, and that they would had been directly liable had they performed those acts themselves.

165.    As a result of the Terrorist Attacks, which was caused, resulted from, and was facilitated by the substantial material and pecuniary inducements and incentives offered and provided by Defendants PLO and PA, Plaintiffs suffered the damages enumerated herein.

166.    Defendants' conduct was outrageous in the extreme, wanton, willful, and malicious, and constitutes a threat to the public at large, warranting an award of punitive damages.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs demand judgment against the Defendants jointly and

severally, as to each of the above counts and causes of action, as follows:

A.    Compensatory damages against all defendants, jointly and severally, in the amount to be determined at trial;

B.    Treble damages, costs and attorney's fees as provided in 18 U.S.C. §2333;

C.    Punitive Damages;

D.    Reasonable costs and expenses;

E.    Reasonable attorneys' fees; and

F.    Such further relief as the Court finds just and equitable.

## JURY DEMAND

Plaintiffs demand a trial by jury.

Dated: September 12, 2025

New York, New York

Respectfully submitted,

/s/ Noel J. Nudelman
Noel J. Nudelman
Richard D. Heideman (to be admitted pro hac vice)
Tracy Reichman Kalik (to be admitted pro hac vice)
Joseph H. Tipograph
HEIDEMAN NUDELMAN & KALIK, P.C.
5335 Wisconsin Avenue, NW
Washington, DC 20015
(202) 463-1818

*Counsel for All Plaintiffs*